In re BRANIFF INTERNATIONAL AIRLINES, INC., Debtor.

BRANIFF INTERNATIONAL AIRLINES, INC., Plaintiff,

v.

AERON AVIATION RESOURCES HOLDINGS II, INC., Defendant–Counterclaimant.

No. CV 92–2540 (ADS).

United States District Court, E.D. New York.

Sept. 30, 1993.

Fisher & Fisher, Brooklyn, NY, for plaintiff.

Winthrop, Stimson, Putnam & Roberts, New York City (Robert S. DeLeon, Leo T. Crowley, of counsel), for defendant-counterclaimant.

Hughes, Hubbard & Reed, New York City (David W. Wiltenburg, of counsel), for Chapter 11 Trustee.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This case is a lamentable reminder of the unfortunate state of affairs in the airline industry in recent years. Founded in Oklahoma City in 1928, Braniff was once among the nation's largest air carriers.[1] However, Braniff filed a voluntary petition for relief under Chapter 11 on August 7, 1991, prior to this lawsuit, in what many have attributed as the aftermath of deregulation in the early 1980s.

This action was filed post-petition and involves certain leasing agreements which Braniff entered into with the defendant aviation company to help keep its business viable. The five aircraft at issue had been previously operated by Eastern Airlines in Eastern's final days. The defendant now moves to withdraw the automatic reference made by the District Court to the Bankruptcy Court and also seeks summary judgment on the amended complaint as well as its counterclaims.

### I. FACTUAL BACKGROUND

#### A. Jurisdiction and Parties

The plaintiff Braniff International Airlines, Inc., ("Braniff") brought this diversity case pursuant to 28 U.S.C. § 1132(a)(2) based upon the purported breach of certain

---

1. See *NEWSDAY*, July 3, 1992.

aircraft lease agreements by the defendant Aeron Aviation Resources Holding II, Inc. ("Aeron"). Braniff is a Texas corporation with its principal place of business in Dallas, Texas. Aeron is a New York corporation engaged in the sale and leasing of commercial aircraft whose principal place of business is in Great Neck, New York.

**B.** *The Amended Complaint*

The complaint in this case was filed on May 29, 1992 and an amended complaint was served on June 3, 1992. According to the plaintiff, in the ordinary course of its business, beginning in January and continuing through March, 1992, and following arms-length negotiations between the parties, Braniff as Lessee and Aeron as Lessor entered into lease agreements for five airframes and corresponding engines. The five leases were substantively identical and provided for, among other things, Braniff's use of the aircraft for a period of twenty-six months.

The leases set forth that the Aircraft were leased to Braniff "as is" and Braniff was permitted to inspect each of the aircraft and to conduct a 60–minute test flight before delivery. Braniff inspected the aircraft and took delivery on the dates of the respective leases and operated the aircraft in regular commercial service thereafter.

One of the lease terms extensively negotiated by the parties was a requirement that Aeron install a Traffic Alert and Collision Avoidance System ("TCAS") on each aircraft to help prevent mid-air collisions. The defendant was also to install a Windshear Warning System ("WWS") on each plane to detect windshear—a phenomenon in which two adjoining layers of air move in opposite directions, which creates a risk that aircraft passing through the two layers will become destabilized. TCAS and WWS are separate and distinct systems requiring separate wiring and installation work.

According to Braniff, the leases stated that the installation of the TCAS was the express obligation of Aeron, and Aeron was entitled to use and apply Braniff's $100,000 security deposit per aircraft to purchase and install this equipment. The leases contained a specific section requiring Braniff to pay Aeron "Basic Rent" of $75,000 per month for the term of the lease, as well as a monthly "Maintenance Reserve" equal to $250 times the number of hours flown. The "First Basic Rent Date" was defined in the first four of the five leases as follows:

"fourteen (14) calendar days following the day on which substantial completion of the installation of the TCAS windshear warning system ("TCAS") is accomplished. TCAS is to be installed on the Aircraft immediately after delivery thereof to Lessee."

"Basic Rent Dates" thereafter would occur on "the same day of each successive calendar month during the Term as occurred the First Basic Rent Date," unless otherwise agreed by the parties (Ben–Yosef Affidavit, Exhibits A–E, p. C–1). According to Braniff, because of Aeron's fraud, only four of the five leases contain the negotiated and agreed upon definition of "First Basic Rent Date."

Braniff claims that Aeron fraudulently modified the fifth lease. On March 18, 1992, Aeron transmitted by facsimile to Braniff the signature page from the fifth lease, dated March 14, 1993, representing to Braniff that because the fifth lease was substantively identical to the other four leases, Aeron did not need to immediately forward the fifth lease in its entirety to Braniff. Counsel for Braniff asserts the following with regard to that fifth lease:

"11. Said material representations were false when made and made for the purpose of inducing Braniff to blindly execute the signature page of that Lease so as to enable Aeron to alter, delete and/or deviate from the parties' agreed upon terms.

\* \* \* \* \* \*

13. In reliance upon Aeron's false representations that the March 14, 1992 Lease and its exhibits were identical to the prior four Leases, Braniff executed the signature page, returned it to Aeron

and accepted the untimely delivery of aircraft N8859E–BN407.

14. Upon information and belief, Aeron, having realized that it could not expeditiously obtain and install all of the TCAS components for all of the aircraft, which was a precondition required to trigger the agreed upon First Basic Rent Date, intentionally and fraudulently altered and deleted the agreed upon condition precedent requiring Aeron to substantially install the TCAS so as to trigger the First Basic Rent Date set forth in Exhibit "C" in the March 14, 1992 Lease."

In the fifth lease, the "First Basic Rent Date" was defined as "March 27, 1992."

According to the defendant, the First Basic Rent Date provision for the first four leases was written to accommodate Braniff's request for a grace period between the date of delivery and the date it would make its first Basic Rent payment. Braniff purportedly claimed that it needed time to paint and otherwise reconfigure the four Aircraft before it could put them into commercial service, and needed some rent-free time at the beginning of the lease term to accomplish this. Aeron also states that Braniff wished to have TCAS in the first four aircraft since Federal Aviation Administration regulations require that at least half an air carrier's fleet be so equipped.

After negotiations, the parties settled on a fourteen day grace period at the outset of the lease term. Braniff paid $450,000 in Basic Rent to Aeron under the leases between early February and mid-April, 1992. During that time, Aeron sent Braniff invoices for Basic Rent and Maintenance Reserves and Braniff paid the amounts specified.

As of the date the complaint was filed, Braniff states that the required TCAS had been installed in only one of the leased aircraft, and that system was not even operational. Consequently, Braniff claimed that the system was not "substantially complete" and adds that there have been partial installations which do not constitute "substantial completion" in accordance with the express terms of the leases. Braniff therefore contends that the condition precedent to making payment of Basic Rent has not yet occurred, despite the fact that Aeron, without contractual or other legal right, served "notice" upon Braniff on May 19, 1992, that it was demanding payment of Basic Rent and Reserves under each of the leases. In addition, Aeron demanded the immediate return of the respective aircraft.

Braniff characterizes these actions as "anticipatory breaches of the leases" and adds that such demands constitute Aeron's repudiation of the express terms and conditions of the leases. According to Braniff, no event of default has occurred, or continues, and Braniff has not waived its right to peaceful and quiet use of the aircraft which are the subject of the leases. The amended complaint also states that if Aeron is permitted to seize the aircraft, Braniff will be irreparably harmed because it will be without a sufficient number of aircraft to conduct its normal scheduling and flights, and will therefore be forced out of business.

Braniff's amended complaint therefore seeks the following relief:

1. a declaratory judgment against Aeron stating that

   (a) Braniff was not in default under the five leases and that Exhibit C of the fifth lease is null and void by virtue of Aeron's fraud;

   (b) Braniff is entitled to continue to possess and use the aircraft which are the subject of the lease;

   (c) payment of the Basic Rent is to commence fourteen calendar days following the day on which substantial completion of the installation of the TCAS is accomplished;

   (d) the rent claimed to be due is not due except in an amount and on a date or dates to be fixed and determined by the Court; and

2. an order and judgment awarding Braniff damages in a sum to be determined at trial, but in no event less than $250,000.

## C. *Answer and Counterclaims*

On June 10, 1992, Aeron filed its answer and counterclaim, denying Braniff's allegations and averring that Braniff was in default under the leases. Aeron asserts the following defenses: (1) Braniff agreed in each and every lease that the aircraft would be delivered "as is," "where is," and "subject to each and every disclaimer of representation and warranty as set forth in subsection 5(a)" and that Braniff accepted delivery on that basis; (2) by virtue of accepting delivery, flying the planes repeatedly in commercial operations, deriving revenues from such operations, and paying Aeron Basic Rent and Maintenance Reserve payments, and the FAA having deemed the planes airworthy with full knowledge of the status of the installation of the TCAS and WWS, Braniff has waived any claim that its obligation to pay rent has not yet begun to run; (3) estoppel; (4) unclean hands; (5) laches; (6) substantial compliance triggering the obligation to pay rent; and (7) Aeron is not responsible for any defects or discrepancies found in the aircrafts' ferry flights since Braniff has failed to allege any discrepancies in its amended complaint.

Aeron has also alleged the following four counterclaims:

1. Aeron is entitled to a declaratory judgment that the leases are in full force and effect, and that the First Basic Rent Dates under the leases occurred on February 11, 1992 for lease no. 52; February 11, 1992 for lease no. 56; February 26, 1991 for lease no. 57; February 29, 1992 for lease no. 55; and March 27, 1992 for lease no. 59;

2. Aeron is entitled to a declaratory judgment that Braniff has waived all of its rights to contest its obligations under the leases on the grounds stated on the amended complaint;

3. Braniff breached the terms of the leases by defaulting on its obligations to make Basic Rent and Maintenance Reserve payments, entitling Aeron to damages of at least $1,348,878;

4. Aeron is entitled to an order of replevin requiring Braniff to immediately surrender possession of the aircraft.

On July 10, 1992, United States Bankruptcy Judge Cecilia Goetz entered an order lifting the automatic stay and permitting Aeron to repossess the aircraft from Braniff, which it did in fact accomplish on July 11, 1992.

## II. *PROCEDURAL SETTING*

The defendant-counterclaimant Aeron brings two motions before the Court. The first motion is set forth pursuant to 28 U.S.C. § 157(d) seeking withdrawal in part of the automatic reference made by the District Court to the Bankruptcy Court pursuant to the standing order of the United States District Court for the Eastern District of New York, dated August 28, 1986.

The second motion is asserted pursuant to Fed.R.Civ.P. 56, and seeks the following relief:

(1) summary judgment in favor of Aeron on Braniff's two claims in its amended complaint;

(2) summary judgment in favor of Aeron on its first two counterclaims;

(3) summary judgment on all issues in Aeron's third counterclaim in its favor, except the issue of damages which defendant contends should be referred to the Bankruptcy Court for determination;

(4) an order dismissing as moot Braniff's request for a declaratory judgment that Braniff is entitled to continue to possess and use Aeron's aircraft.

### A. *Withdrawal of Reference*

Braniff filed a voluntary petition for relief under Chapter 11 on August 7, 1991. Pursuant to 11 U.S.C. §§ 1107 and 1108, Braniff has retained possession of its property and is authorized as a debtor in possession to continue the operation and management of its business.

Defendant Aeron seeks withdrawal of the reference to the Bankruptcy Court to the extent necessary to adjudicate fully the

claims, counterclaims, and defenses asserted in this District Court action brought by Braniff International Airlines, Inc. According to Aeron, Braniff chose in an atypical fashion to bring this state law contract dispute as a diversity action in the Federal District Court rather than as an adversary proceeding in the Bankruptcy Court.

As a post-petition contract dispute, the defendant maintains that this action is also a core proceeding in Braniff's Chapter 11 case. Since the District Court and the Bankruptcy Court have concurrent jurisdiction over the dispute, Aeron contends that it is in the interest of judicial economy to resolve the dispute fully in one forum. According to Aeron, the automatic referral contemplated by the Eastern District Standing Order is inapplicable because the Debtor selected the District Court as its forum. Since Braniff had its choice and has chosen the District Court, Aeron contends it is estopped from objecting to withdrawal of the reference.

In response, counsel to the Trustee in bankruptcy of the plaintiff Braniff notes that this action was commenced in the District Court by prior management of Braniff, before the Trustee's appointment on August 12, 1992. Because Aeron has repossessed the aircraft, the Trustee argues that the main claim in the amended complaint is moot. He also contends that Aeron's counterclaims are essentially claims in the Braniff bankruptcy and should be resolved in the regular course of bankruptcy claims administration. In his Affidavit, counsel to the Trustee states as follows:

"... The situation which the Trustee inherited upon is appointment was that of a non-operating airline in general disarray following shutdown of flight operations.... there are no remaining Braniff employees who were personally involved in the Debtor's dealings with Aeron. There is insufficient cash to pay even basic payroll and tax expenses and other necessary expenses relating to preservation of assets and wind-up of the Braniff estate....

5. We have also been informed that Braniff's counsel of record in this case does not wish to continue in the face of the probability that any legal services related to this case will go unpaid...." (Wiltenburg Affidavit).

The Trustee further observes that Aeron may be entitled to an administrative expense priority in bankruptcy to the extent that the leases provided benefit to the Debtor's estate. In fact, Aeron filed an Administrative Proof of Claim for an amount in excess of $10 million on August 14, 1992. The Trustee believes that the counterclaim now before the Court represents a portion of that $10 million.

According to counsel for the Trustee, no discovery has been had and no depositions taken in this case and there is no money in the Estate at this juncture to litigate claims or pay claimants. Counsel for the Trustee also states that the counterclaims are subject to mandatory referral to the Bankruptcy Court and should be adjudicated as a core proceeding in the claims administration process of the Bankruptcy Court.

## B. *Summary Judgment*

Aeron moves, pursuant to Fed.R.Civ.P. 56, for summary judgment dismissing the complaint. It also moves for summary judgment on its first two counterclaims, seeking a declaratory judgment that the leases are in full force and effect and that rents are due and owing as of the respective dates noted, and that Braniff has waived all rights to contest these obligations. With regard to the third counterclaim, Aeron seeks summary judgment holding Braniff in breach of the leases by its alleged default and further seeks to have this Court refer the damages to the Bankruptcy Court for disposition. Finally, Aeron seeks an order dismissing as moot Braniff's request for a declaratory judgment that Braniff is entitled to continued possession and use of the aircraft.

The defendant Aeron claims that Braniff brought this action, having already defaulted on more than $1.3 million in rent payments to Aeron, in order to preempt Aeron from exercising its contractual remedies to

address Braniff's defaults. Counsel notes that

> "[t]he complaint asserted that Braniff was entitled to use the five aircraft rent-free for months, even while its [sic] was flying each of them nearly three hundred hours per month in regular revenue-generating commercial operations. This argument was based upon an improbable reading of the leases, to the effect that Braniff was not obligated to pay any rent until the installation of certain equipment[,] not essential to the airworthiness and operation of the aircraft[,] was 'substantially complete.' ..." (Defendant's Brief, at p. 2).

In support of the summary judgment motion, the defendant has supplied the affidavits of Eldad Ben–Yosef, the President of Aeron, Robert DeLeon, Esq., and Maurice W. Heller, counsel for Aeron as well as the declaration of Lauren B. Nelson, President of Avitas Engineering and Aeron's expert.

Ben–Yosef states that the First Basic Rent Date provision required installation to be "substantially complete," rather than "complete" because manufacturers of the WWS systems were experiencing long backlogs in orders for the plug-in WWS computer module, which was essential to the installation of WWS. According to Ben–Yosef, this presented problems for Jeffrey Chodorow, President of Braniff:

> "... the Lease for Aircraft No. 59 included a date certain, March 27, 1992, as the First Basic Rent Date. This was done because Braniff told us that it needed this Aircraft immediately, and could not afford the ground time it would take to perform the installations of TCAS and WWS. Braniff told us that it had sufficient aircraft in its fleet with TCAS and WWS installations that the FAA had accepted, and that the installations for Aircraft 59 could wait until that Aircraft's "C" check in the fall.

16. Thus, after having initially rejected Aircraft No. 59, Braniff reconsidered, and agreed to lease it. Unlike the four others, however, we agreed that no TCAS and WWS work would be done at the outset of the Lease term, and that Braniff would begin to operate the Aircraft immediately after the reconfiguration, painting and other work was completed.

17. Shortly before it shut down its operations, Braniff informed DynAir Avionics, Inc. ("DynAir"), the entity charged with installing WWS and TCAS, that it would not make Aircraft No. 59 available for the installation of TCAS and WWS until sometime in October of 1992, the rescheduled date for the "C" check.... The parties agreed that Braniff would have a 14 day grace period per Aircraft and we by no means intended to allow Braniff to use an Aircraft for one day more than the grace period without payment of Basic Rent."

The parties contemplated that No. 59 would be delivered to Braniff on March 13, 1992, and the fourteen-day grace period was to end on March 27, 1992, the First Basic Rent Date. The aircraft was in fact delivered to Braniff on March 14, 1992.

Aeron's expert, Lauren B. Nelson, states that in her opinion, the installations of the TCAS and WWS were substantially complete as of the following dates:

- Aircraft No. 52:    January 28, 1992
- Aircraft No. 56:    January 28, 1992
- Aircraft No. 57:    February 12, 1992
- Aircraft No. 55:    February 15, 1992

In letters to the FAA dated January 24 and March 19, 1992, Braniff certified that WWS provisions were installed in these aircraft.

According to Ben–Yosef, Aeron sent invoices to Braniff between early February and mid-April, 1992, and Braniff paid the amounts specified for Basic Rent and Maintenance Reserves. In April, however, Braniff stopped paying rent. Ben–Yosef states that Aeron was becoming increasingly concerned about Braniff's deteriorating financial condition and therefore sent out a notice of default on May 20, 1992. Additional notices of default were sent on June 5 and June 12, 1992.

Although the parties were purportedly in the final stages of drafting settlement doc-

uments on May 21, 1992, to the great surprise of Aeron, on May 22, 1992 Braniff's counsel asserted that Braniff was not obligated to pay any rent on the aircraft because Aeron had not substantially completed installation of TCAS and WWS. Braniff also purportedly repudiated any obligation to consummate the negotiated settlement and stated that past payments of Basic Rent to Aeron had been a "mistake." Aeron observes that one month after it initiated this suit, Braniff ceased all operations on July 2, 1992. With permission of the Court, Aeron repossessed the aircraft on July 11, 1992.

Even if the Court agrees with Aeron on contract issues, the Trustee argues that "this will not necessarily resolve the extent of Aeron's entitlement to an administrative expense claim." Counsel maintains that this Court cannot fully adjudicate rights as between Aeron and the Braniff estate, and therefore the claim should remain in the Bankruptcy Court where it can be determined with the claims of all other post-petition creditors.

In the alternative, counsel for the Trustee argues that if Aeron's claims are withdrawn from the Bankruptcy Court, the summary judgment motion should be adjourned and the Trustee granted a continuance without date pursuant to Fed.R.Civ.P. 56(f) to permit affidavits to be obtained or depositions to be taken. Counsel adds that this litigation should be stayed for a period of 120 days to allow for a determination of whether any purpose would be served by proceeding. Further, if the Court decides to reach Aeron's summary judgment motion, counsel for the Trustee contends that the motion must be denied because there are sharp disputes as to the scope, timing and completion of work contemplated under the contracts, and whether there was "substantial completion" of the work.

Conceding that one of the claims against it is now moot, Aeron contends that the Trustee ignores three-quarters of the amended complaint and counterclaims. Specifically, counsel states that Braniff has claims remaining, including: (1) that Braniff does not owe Aeron any rent for the aircraft because Aeron (a) fraudulently modified one of the five aircraft leases and (b) did not substantially complete the TCAS system installations in any of the aircraft; and (2) that Aeron owes Braniff $250,000. Likewise, although Aeron's fourth counterclaim seeking replevin is moot, the three remaining counterclaims are live disputes, ripe for adjudication.

Counsel for Aeron urges the Court to withdraw the reference because "[h]aving decided that its litigation chances were better in District Court, Braniff and its trustee (as its successor) should not be permitted to move back to the Bankruptcy Court after Aeron has expended substantial resources in the District Court litigation. That would be forum shopping and re-shopping of the worst kind" (Defendant–Counterclaimant's Reply Memorandum, at p. 4).

### III. THE GOVERNING LAW

#### A. Withdrawal of Reference to Bankruptcy Court

In the wake of *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), Congress enacted 28 U.S.C. § 1334 which provides that the District Courts shall have original and exclusive jurisdiction of all cases under Title 11. However, a bankruptcy judge is directed pursuant to 28 U.S.C. § 157(b)(1) to hear and determine all cases under Title 11 and all core proceedings arising under Title 11 of the Bankruptcy Code. Therefore, proceedings arising under Title 11 are referred automatically to the United States Bankruptcy Court (28 U.S.C. § 157[a]). Section 157(d) also provides that

"[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regu-

lating organization or activities affecting interstate commerce."

■ Therefore, withdrawal of bankruptcy reference is available if the motion is timely and for cause shown.

### B. *Rule 56(f)*

■ Rule 56(f) provides as follows:

"**(f) When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

In order to obtain a continuance to permit additional discovery, the proponent seeking the continuance must establish that he was denied reasonable access to material requested and that the material requested constitutes potentially favorable information. In addition, the proponent must identify specific issues to be disclosed if he is granted a reasonable opportunity to pursue additional discovery (*Contemporary Mission, Inc. v. New York Times Co.*, 665 F.Supp. 248 [S.D.N.Y.1987], *aff'd*, 842 F.2d 612 [2d Cir.], *cert. denied*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 [1988]).

### IV. *DISCUSSION*

### A. *Withdrawal of the Reference*

■ The Court first notes that the law is clear that the automatic stay does not apply to actions commenced by the debtor, either before or after a bankruptcy (*see In re Wengert Transp., Inc.*, 59 B.R. 226, 228 [Bankr.N.D.Iowa, 1986], citing *In re Ruble*, 34 B.R. 37 [Bankr.N.D.Ohio 1983]). "When the tables are turned and it is the *debtor* who is asserting the claim, the policy concerns supporting the stay are no longer relevant. The protections for the debtor under the Bankruptcy Code operate as a shield, not a sword" (*Merchants & Farmers Bank of Dumas, Ark. v. Hill*, 122 B.R. 539, 546 [E.D.Ark.1990]) (emphasis in the original).

Here, significantly, the debtor chose the forum of the District Court.

■ "Good cause" is not defined in 28 U.S.C. § 157. Therefore, courts employ a factor analysis to determine whether cause exists. Several courts have listed factors that may be considered in determining a motion for permissive withdrawal under § 157(d). These factors are:

(1) uniformity in bankruptcy administration;

(2) reduction of forum shopping and confusion;

(3) fostering the economical use of debtors' and creditors' resources; and

(4) expediting the bankruptcy process.

*See In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir.1990), quoting *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir.1985).

■ An important factor in determining whether to withdraw reference of a proceeding to the bankruptcy court is whether the claim is a core proceeding (28 U.S.C. § 157). Core proceedings are generally defined as matters arising under Title 11, or arising in a case under Title 11 and which would have no existence outside the bankruptcy case. *Diamond Mortgage Corp. of Ill. v. Sugar, (In re Sugar)*, 913 F.2d 1233 (7th Cir.1990); *In re J.T. Moran Financial Corp.*, 119 B.R. 447, 450 (Bankr.S.D.N.Y. 1990). Core proceedings are matters which govern the administration of the debtor's estate and are proceedings traditionally within the realm of the bankruptcy court's equitable authority.

Courts have held that certain post-petition transactions are matters concerning the administration of the bankruptcy estate within the meaning of 28 U.S.C. § 157(b)(2)(A) and should be treated as core proceedings. Thus, a post-petition contract entered into with the debtor was regarded as a core matter in *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1399 (2d Cir.1990), *cert. granted*, 497 U.S. 1023, 110 S.Ct. 3269, 111 L.Ed.2d 779, *vacated and remanded*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated on remand*, 924 F.2d 36

(2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991), ("post-petition contracts with the debtor-in-possession, therefore, are integral to the estate administration from the date they are entered into").

Similarly, in *In re Arnold Print Works, Inc.,* 815 F.2d 165 (1st Cir.1987), a suit by a debtor to recover the remainder of the purchase price of assets sold after the filing of the petition was held to be a core matter. The *Arnold* court observed that

> Parties who contract with the bankrupt company's trustee or with a debtor-in-possession know that they are dealing with an agent responsible to a bankruptcy court; that the bankruptcy court would resolve subsequent disputes should therefore come as no surprise (815 F.2d at 170).

The defendant does not dispute that the instant case is a core proceeding and it has not asserted any Seventh Amendment right to a jury trial. There is, however, a body of case law supporting defendant's right to a jury trial in a scenario similar to this.

Case law also suggests that if the trial in such cases would be a complicated proceeding, the case should be adjudicated in District Court as opposed to the Bankruptcy Court. *In re Leedy Mortgage Company, Inc.,* 62 B.R. 303 (E.D.Pa.1986) involved a bankruptcy trustee who brought an adversary proceeding against accounting firms and partners, and defendants moved for withdrawal of the reference. The court said that

> "[u]nlike the matters concerning the bankruptcy matter, this case could require extensive discovery. The parties in this action will have to study many volumes of written material and depose many individuals.... In addition, the parties will have to hire experts.... The trial will be lengthy and complex.... Also, unlike most bankruptcy proceedings, it will require a jury and extensive examination of documents and witnesses. At the conclusion of the evidence, the court will have to instruct the jury on the law of contract.... All this contrasts

with that which typically occurs before the bankruptcy court (*id.* at 306).

Furthermore, in *In re Ben Cooper,* 896 F.2d 1394 (2d Cir.1990), the debtor in possession commenced an adversary proceeding in the bankruptcy court in relation to a post-petition contract. The court found the proceeding to be within the bankruptcy court's core jurisdiction but further concluded that the defendants in the adversary proceeding were entitled to a jury trial, and granted the request to withdraw the reference.

■ Where a trustee in bankruptcy has elected to pursue litigation in a forum other than bankruptcy court, he is estopped from requesting a later referral to the bankruptcy court (*see* 1 Collier on Bankruptcy ¶ 3.01[5][c] (15th Ed.1992) at 3–93). The parties have expended considerable time, energy and expense in bringing this rather voluminous motion for summary judgment. Having considered the above factors, the Court finds that the interest of judicial economy and utilization of resources is best served by adjudicating the rights of the parties in this Court. Therefore, the defendant's motion to withdraw the referral under § 157(d) of the Bankruptcy Code is granted.

## B. *Rule 56(f)*

■ In light of the confusion surrounding what appears to be the departure of counsel for Braniff in this matter, the subsequent appointment of the Trustee, the closing down of Braniff's operations, and the inability of the Trustee to ascertain the whereabouts at this point of the former employees from whom counsel would need to obtain affidavits, the Court determines in the interest of justice that a continuance is warranted.

The Court further finds that upon review of the Trustee's "Counter–Statement Pursuant to Rule 3(g)," there are significant questions to be resolved in this matter. Several of these involve whether Aeron fulfilled the condition precedent, the mixed question of law and fact concerning "substantial completion" as that issue has been

set forth, when precisely Braniff's obligation to pay rent began, whether the form of the lease governing aircraft 59 was fraudulently altered by Aeron, and whether Aeron misrepresented the condition and fitness for use of the aircraft. In light of these findings, the Court grants the Trustee's application for a continuance.

## V. CONCLUSION

For the reasons set forth above, the motion by the defendant Aeron pursuant to 28 U.S.C. § 157(d) for withdrawal of the automatic reference to the Bankruptcy Court is granted. Further, the motion by plaintiff Braniff for a declaratory judgment that it is entitled to continue to possess and use Aeron's aircraft is dismissed as moot.

With regard to the summary judgment motion made by Aeron, the Court hereby grants the plaintiff Trustee a continuance of 45 days within which to obtain the necessary affidavits and/or depositions to appropriately respond to the defendant's summary judgment motion on the amended complaint and the counterclaims.

**SO ORDERED.**